# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01017-COA

**CHARLES GANDY A/K/A CHARLES TERRELL GANDY A/K/A CHARLES T. GANDY**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:                08/01/2023
TRIAL JUDGE:                HON. MICHAEL PAUL MILLS JR.
COURT FROM WHICH APPEALED:    LEE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:            JOHN DAVID WEDDLE
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 10/01/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Lee County Circuit Court jury convicted Charles Gandy of two counts of sexual battery and two counts of gratification of lust against his adolescent stepdaughter, Jane.[1]  The circuit court sentenced Gandy to thirty years each for the two sexual battery convictions and to fifteen years each for the two gratification of lust convictions, with all four sentences to be served concurrently in the custody of the Mississippi Department of Corrections (MDOC). Gandy moved for a judgment notwithstanding the verdict or a new trial.  Because the motion

---

[1] The Court will use pseudonyms for the alleged victim and her family members to protect the victim's identity.

had remained pending thirty days after the entry of judgment, the motion was deemed denied by operation of law under Mississippi Rule of Criminal Procedure 25.3.

¶2.     Gandy appeals, asserting that the verdict is contrary to the overwhelming weight of the evidence, and, therefore, a new trial is warranted. We are unpersuaded by Gandy's arguments on his sole assignment of error. Thus, we affirm Gandy's convictions and sentences.

### STATEMENT OF FACTS

¶3.     At trial, the State presented the testimony of Jane, her mother Mary, Jane's older brother Joe, Lieutenant Roy Noe, and Investigator Cassidy Jumper. Gandy testified in his defense.

¶4.     Gandy began living with Mary in 2012 or 2013. Mary had two children: Jane, who was six at the time Gandy began living in the family townhome, and Joe, who is about five years older than Jane. Gandy became a father figure to both children. Gandy and Mary were together for about nine years and were married for two of those years.

¶5.     Jane testified that Gandy had been a good father figure when she was younger, but their relationship changed when she was thirteen when Jane "noticed that he started looking at [her] different[ly]." At that time, "He started touching on me . . . . He touched me on my boobs and my vagina and just touching me inappropriately that I didn't like, and I didn't understand what he was doing at the time, because I was young."

¶6.     Jane testified that the first time Gandy touched her was when they were alone in the living room while her mother and brother were asleep upstairs. This type of touching would

happen "about twice a week" from then on for about a year, and it would take place on the living room couch. Jane also described times when Gandy touched her butt while she was in the kitchen when her mother and brother were in the living room.

¶7.    Jane testified that one time, Gandy showed her pornography on his phone. They were in the living room, and Gandy told Jane he was "showing [her] the birds and the bees" and "telling her about sex and all that stuff." Jane described another time when Gandy took off Jane's clothes, "put his mouth on [her] vagina," and began "licking it." Jane testified that this had happened "more than one time" and always on the living room couch while her mother and brother were upstairs. She also testified that Gandy touched her breasts and rubbed her vagina multiple times.

¶8.    Jane testified that Gandy began having sex with her about two months after the inappropriate touching began. She was thirteen years old the first time they had sex and fourteen years old the last time. Jane testified that when she would ask Gandy to stop, "he would take a break, and then he would start right back up."

¶9.    Joe testified that he believed that something inappropriate had been going on between Gandy and Jane for some time. He said, "[Gandy and Jane] would be by themselves downstairs a lot . . . and every time I would catch them downstairs, they would be close and then . . . [Gandy] would . . . distance himself and try to act normal. And it was just . . . very weird, . . . awkward." Joe testified that he "noticed it numerous times" but did not want to confront them unless he was "sure."

¶10.    Jane's trial testimony corroborated Joe's testimony about his suspicions. Jane said,

3

"I remember the times my brother used to come downstairs and almost catch us." When that would happen, Gandy "would run to the bathroom." She said that "if [Gandy] heard any kind of footsteps or any kind of movement, he would jump up and get scared."

¶11.    Jane testified that she did not tell anyone about what was happening between her and Gandy. She said Gandy told her to "take it to the grave" with her. Jane testified that she was afraid of what would happen if she told anyone. She never told anyone until her mother found out.

¶12.    The final time Gandy touched Jane happened in the early morning hours after Mary and Joe had gone upstairs. Gandy and Jane were downstairs in the living room. Jane testified that Gandy was touching her breasts when Joe came downstairs. Joe testified that he saw Gandy kneeling in front of Jane, who was "on her back" on the couch. Gandy's head was "around … her chest area." When Gandy noticed him coming downstairs, he [(Gandy)] "got up real fast and went into the bathroom[.]" Joe said that he "looked at [his] sister, and she was adjusting her bra back into position." Her bra was "lowered," exposing her breasts. Joe went back upstairs, and Gandy started calling his name. Joe ignored Gandy and pretended not to hear him. Joe went into the bathroom, "and then a couple of seconds later, [Gandy] came behind [him] and said, 'Do you—did you see your sister? Was she asleep?'" Joe said that he lied and told Gandy he had seen nothing.

¶13.    Joe then texted his mother about what he had seen. Mary testified that she was asleep in her bedroom at the time but saw the text when she woke up later that morning. She immediately started screaming and questioning Gandy, who by that time had gotten into bed

4

with her. Mary said that Gandy did not respond at all.

¶14. Mary then ran to Jane's room, woke her up, and said, "Tell me he did not do this . . . . Was he touching you? . . . Where was he touching you? What was he doing?" Joe said Jane started crying and said, "He was touching me in my private areas." Joe testified that Gandy then denied anything happened.

¶15. Joe had also sent a text message to his cousin John, who arrived at their home and asked Gandy whether he had been inappropriate with Jane. According to Joe, Gandy told John, "Yes, I was teaching her how boys shouldn't touch her."

¶16. A 911 call was made to the Tupelo Police Department, reporting that the family believed Gandy "had abused a young female juvenile" in their home. Lieutenant Roy Noe responded to the call. At the scene, Gandy gave a statement denying the accusations against him. Gandy said, "he was just teaching [Jane]" and that he "didn't touch her, but . . . was showing her the difference between boys and girls because of her age."

¶17. Investigator Cassidy Jumper was assigned to investigate the case. She arranged for Jane to have a forensic interview with the Children's Advocacy Center. Investigator Jumper was present for the interview and testified that Jane disclosed sexual abuse by Gandy. Additionally, Investigator Jumper brought Joe to the police department and got a statement from him. After reviewing the initial report, the forensic interview, and the witness statement from Joe, Investigator Jumper "went to Tupelo Municipal Court where [Mary] pursued charges against Mr. Gandy." Gandy was arrested. He was read and then waived his

5

*Miranda*[2] rights and was then interviewed by Investigator Jumper. The interview was recorded and played for the jury at trial.

¶18. Investigator Jumper also testified about the interview at trial. She testified, "At the beginning of the interview, [Gandy] told me that he was trying to teach [Jane] what boys were not to do." "Mr. Gandy told me that he inappropriately touched [Jane] one time, and he demonstrated this with his right hand and index fingers making a . . . circular motion on [Jane's] vagina." Gandy said that this had been going on for less than a year. Investigator Jumper asked Gandy if he had "placed his penis inside [Jane's] vagina [twenty] times." Gandy "quickly responded no." She next asked if he had put his penis inside Jane's vagina five times. He again "quickly responded no." Investigator Jumper then asked if he had put his penis inside Jane's vagina twice. That time, Gandy gave no response.

¶19. At the end of the interview, Gandy gave a signed, written statement. Investigator Jumper read Gandy's statement to the jury, and it was admitted as an exhibit at trial. The statement provided:

> I was trying to teach [Jane] right from wrong when the boys started coming around. I was telling her that the boys just wanted one thing, I was telling her that. This started not a year ago, the only thing I done was touch her inappropriately on her vagina, with my finger.

¶20. After interviewing Joe, Jane, and Gandy, Investigator Jumper charged Gandy with sexual battery and fondling. After his arrest, Mary was granted a divorce from Gandy on adultery grounds for "[t]he things he had done to [Jane]."

¶21. Gandy testified in his own defense and denied all the allegations of the four-count

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

indictment. He also recanted his admission to Investigator Jumper. Gandy testified that his admission to touching Jane during his interrogation was unintentional and resulted from him being scared and disoriented because he had never been in any kind of trouble before. Gandy said that during the interrogation, he was still experiencing the shock and anxiety of six police officers coming to his house to arrest him. Gandy admitted signing the statement and waiver but said he had not read the documents beforehand, and if he had, he claimed he would not have signed.

¶22. Regarding the admission, Gandy said that his words did not come out right. He said he meant to say that he had "pointed at [Jane's] vagina when [he] was talking about the boys and bees." Gandy said he and Mary discussed him having the "birds-and-bees conversation" with Jane. Gandy claimed Mary told him to "do whatever [he] had to do." But when asked if he told Mary that he planned to show Jane pornography, touch Jane's vagina, lick Jane's vagina, or touch Jane's breasts, Gandy repeatedly answered that he did not recall. Gandy testified that he was not doing anything wrong when Joe came down the stairs that morning. He denied ever having sex with Jane and denied ever touching her inappropriately.

## STANDARD OF REVIEW

¶23. In this context, "[a] motion for a new trial simply challenges the weight of the evidence." *Burden v. State*, 347 So. 3d 174, 177 (¶14) (Miss. 2022).[3] The appellate courts "will reverse the lower court's denial of a motion for a new trial only if, by doing so, the

---

[3] As in this case, the defendant in *Burden* moved for a new trial, but no ruling was made on the motion. *Id.* The motion "was deemed denied by operation of law based on Mississippi Rule of Criminal Procedure 25.3, under which a motion for new trial is deemed denied, if not ruled on, thirty days after its filing." *Id.*

court abused its discretion." *Id.* In reviewing whether a verdict is against the overwhelming weight of the evidence, "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

## DISCUSSION

### The Overwhelming Weight of the Evidence

¶24. Gandy asserts that the verdict in this case was contrary to the weight of the evidence because "[o]verall, [Jane's] testimony was inconsistent, uncorroborated, unreliable, and contradictory." We are unpersuaded by Gandy's assertions for the reasons addressed below.

¶25. In undergoing our analysis, we bear in mind the overriding principle "that the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence." *Lindsey v. State*, 212 So. 3d 44, 47 (¶14) (Miss. 2017). "This principle applies especially if the conduct of the victim is consistent with the conduct of one who has been victimized by a sex crime." *Id.* at 48 (¶14) (internal quotation mark omitted). As such, "the relevant inquiry in this case is not whether [Jane's] . . . testimon[y] [was] . . . corroborated, but whether . . . [her] testimony was] so discredited or contradicted by other credible evidence that a reasonable jury could not have believed [her]." *Id.*

¶26. Gandy recognizes these principles but asserts that Jane's "uncorroborated" testimony was "inconsistent" and "contradicted" by other evidence. We examine Gandy's assertions

8

in turn.

¶27.    With respect to the purportedly uncorroborated nature of Jane's testimony, Gandy asserts that "[Jane's] testimony was completely uncorroborated by the brother and mother. There was no physical, forensic, or medical evidence.  The only arguable corroboration was Gandy's so-called admission, but Gandy disputed that."

¶28.    Regarding the first assertion, Gandy argues that Jane's testimony was not corroborated by Joe or Mary.  Gandy, however, cites no contradictions between Jane's testimony and the testimonies of her brother or mother, so this assertion does nothing to support his argument that a new trial is warranted.  *Id.*  Further, the testimonies of both Joe and Mary do corroborate Jane's testimony.  For example, Jane testified about times when Joe would come downstairs and nearly catch her and Gandy.  She said that when this would happen, Gandy "would jump up and get scared" and "run to the bathroom."  These circumstances were corroborated by Joe's testimony about his suspicions that something was wrong.  He testified that "numerous times" he "would catch [Jane and Gandy] downstairs, they would be close and then . . . [Gandy] would . . . distance himself and try to act normal.  And it was just . . . very weird, . . . awkward."  Further, in describing the final incident that led to the 911 call, Jane and Joe both testified that Joe walked downstairs one night while Gandy was kneeling in front of Jane with Jane lying on the couch and her breasts exposed.  Jane testified that Gandy was touching her breasts at the time, and Joe testified that Gandy's head was "around . . . her chest area."  Mary did not testify about the incidents that happened because she did not know about them.  But Mary did testify about confronting Gandy and the events that

9

followed. Her testimony was consistent with Jane's testimony.

¶29. Gandy next argues that "[t]here was no physical, forensic, or medical evidence." But in *Pierce*, for example, this Court found that the victim's testimony alone was sufficient to sustain a conviction for sexual battery regardless of the lack of corroborating medical or physical evidence. *Pierce v. State*, 135 So. 3d 206, 209 (¶13) (Miss. Ct. App. 2014). "[T]he existence of physical evidence is not a prerequisite to sustaining a conviction of sexual battery," nor is there a "requirement that evidence of sexual battery has to be corroborated and supported by medical evidence, testimony of other witnesses on the issue of consent, or incriminating statements of the defendant before a conviction for the offense will be allowed to stand." *Id.*; *accord Sims v. State*, 127 So. 3d 307, 313 (¶20) (Miss. Ct. App. 2013) ("Physical evidence is not required to sustain [defendant's] convictions of . . . statutory rape, sexual battery, or gratification of lust."). We are unpersuaded by Gandy's contention on this point.

¶30. Gandy's third assertion regarding corroboration is that "the only arguable corroboration" to Jane's testimony was the confession he gave during his interview and in his signed, written statement, "but [he] disputes that." As detailed above, Gandy recanted his confession when he testified at trial. As to Gandy's contention on this issue, we simply observe that "when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Little*, 233 So. 3d at 292 (¶20). Whether Gandy's confession or his testimony recanting his confession should be believed was for the jury to decide.

10

¶31. Gandy also asserts that Jane's testimony alone is not sufficient in this case because it was "contradicted" by other evidence and was "not consistent with the circumstances." Gandy describes purported discrepancies in Jane's testimony to support this contention. In doing so, however, Gandy essentially asks this Court to reweigh the evidence presented and resolve alleged conflicts in Jane's testimony. But, again, that is not this Court's role: "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* at 289 (¶1). In any event, we find that what Gandy deems "discrepancies" are not discrepancies when examined in the context of the testimonies presented.

¶32. For example, Gandy asserts that because the incidents "occurred in a small apartment with other family members present, . . . [i]t is unlikely that what [Jane] alleged actually occurred without someone being able to hear." But Jane testified that the incidents happened in the living room on the ground floor of the townhome while her mother and Joe were upstairs in their rooms. Further, Jane testified about the precautions Gandy took against getting caught. She testified that "if [Gandy] heard any kind of footsteps or any kind of movement" when these incidents were occurring, "he would jump up and get scared" and "run to the bathroom." As we noted above, Joe similarly testified there were "numerous times" when he "would catch them downstairs, they would be close and then . . . [Gandy] would . . . distance himself and try to act normal." A reasonable juror could certainly find that others in the household did not hear anything on these facts.

¶33. Gandy also asserts that Jane "said that she felt ashamed, but also said that she did not

11

know it was wrong until she received therapy." Jane testified that she felt ashamed for not telling her mother and brother about the abuse sooner. She also explained that the reason she did not tell them was that she was afraid, and Gandy told her not to. When asked at trial whether at age thirteen she knew what was going on when the abuse started, Jane testified, "Not really. I just knew that it wasn't normal . . . [until] I started going to therapy [and] . . . found out that what [Gandy] was doing was wrong." Given these circumstances, we find no basis for Gandy's assertion that Jane's shame for not telling her family sooner or her understanding of the gravity of the abuse goes against the weight of the evidence.

¶34. A third example Gandy cites as a purported discrepancy in Jane's testimony is that she "contradicted herself when stating the number of times the alleged cunnilingus occurred." But the jury heard Jane's testimony in full and could reasonably find no contradiction. Jane was asked about "some . . . times" when Gandy would touch her but not have sex with her. Jane responded, "[O]ne time I can recall he put his mouth on my vagina[,] . . . [and] [h]e was licking it." A juror could reasonably find that Jane was describing an example of a time when this type of contact happened. Such a finding is particularly reasonable here because Jane was then asked whether this activity happened more than one time. Jane responded, "More than one time." Jane did not contradict herself.

¶35. Gandy also argues that Jane "never said a word" about the incidents, apparently asserting that her silence reveals some sort of an inconsistency in Jane's behavior or testimony. But a victim's delay in reporting sexual abuse is "consistent with the conduct of a person victimized by a sex crime." *Massey v. State*, 992 So. 2d 1161, 1164 (¶15) (Miss.

12

2008); *see Lindsey*, 212 So. 3d at 49 (¶17). Indeed, in this case Jane testified that she did not report Gandy's actions because "[Gandy] told me to take it to the grave with me. And . . . I was afraid of, like, what would happen." At another point in her testimony, Jane said, "I was afraid of what [Gandy] would do to me and my mom [if she told anyone what Gandy did to her]."

**CONCLUSION**

¶36. The jury in this case heard Jane's detailed testimony about Gandy's sexual abuse. She told the jury that it began with inappropriate touching when she was thirteen years old and progressed to intercourse after about two months, and she was fourteen the last time it happened. The family lived in a two-story townhome, and Jane testified that the incidents happened downstairs while Gandy and Jane were alone when Jane's mother and brother were upstairs. Jane testified that she did not tell her mother or brother what was happening because she was afraid of what would happen, and Gandy told her to "take it to her grave." Gandy confessed to rubbing Jane's vagina both during his interview and in a written, signed statement. His reason for recanting this confession at trial was that his words did not come out right during his interview with Investigator Jumper because he was scared and disoriented.

¶37. After weighing the evidence, resolving conflicts, and assessing witness credibility, the jury here concluded beyond a reasonable doubt that Gandy committed the charged crimes. Viewing that evidence in the light most favorable to the verdict, as we must, we find that the jury's verdict was not "so contrary to the overwhelming weight of the evidence that to allow

13

[the verdicts] to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 289

(¶1). Accordingly, we affirm Gandy's convictions and sentences.

¶38. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**